**No. 26-4310**

---

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE NINTH CIRCUIT**

---

**LIGIA GARCIA, et al.**,
Appellees,

v.

**POLLY KAISER, et al.**,
Appellants.

---

On Appeal from the United States District Court
for the Northern District of California
District Court Case No. 25-cv-06487-PCP

---

**OPENING BRIEF FOR APPELLANTS**


BRETT A. SHUMATE
Assistant Attorney General

DREW C. ENSIGN
Deputy Assistant Attorney General

MARY L. LARAKERS
*Senior Litigation Counsel*

LUZ MARIA RESTREPO
*Senior Litigation Counsel*
U.S. Department of Justice,
Civil Division
Office of Immigration Litigation
P.O. Box 878
Ben Franklin Station
Washington, D.C. 20044
Phone: (202) 598-2443
Luz.Maria.Restrepo@usdoj.gov

# TABLES OF CONTENTS

INTRODUCTION ........................................................................................ 1

ISSUES PRESENTED ........................................................................................ 8

STATEMENT OF THE CASE AND RELEVANT FACTS ........................... 8

STANDARD OF REVIEW ........................................................................ 24

SUMMARY OF THE ARGUMENT ........................................................... 25

ARGUMENT ........................................................................................ 27

I. THE DISTRICT COURT LACKED JURISDICTION TO REVIEW PLAINTIFFS' APA CLAIMS ........................................................ 27

A. The Challenged Guidance Are Not Final Agency Action ........................................................................................ 27

B. Plaintiffs Have Another Remedy Available for the Waiver Claim ........................................................................................ 34

C. The Challenged Guidance is Not Reviewable Because it is Committed to Agency Discretion ........................................ 36

II. THE CHALLENGED GUIDANCE IS NOT ARBITRARY AND CAPRCIOUS ........................................................................ 44

A. The 12-Hour Waiver Guidance is Not Arbitrary and Capricious ........................................................................................ 45

B. The ICE Courthouse Arrest Guidance is Not Arbitrary an Capricious ........................................................................ 51

C. EOIR's Guidance is Not Arbitrary and Capricious ........................................................................................ 57

D. No Formal Procedure Was Required to Rescind the Challenged Guidance ........ 62

III. THE DISTRICT COURT ABUSED ITS DISCRETION IN ISSUING A NATIONWIDE VACATUR ........ 63

CONCLUSION ........ 66

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

**TABLE OF AUTHORITIES**

**Cases**

*Arizona v. United States*,
567 U.S. 387 (2012) .......... 36

*ASSE Int'l, Inc. v. Kerry*,
803 F.3d 1059 (9th Cir. 2015) .......... 39

*Atl. Richfield Co. v. Christian*,
590 U.S. 1 (2020) .......... 41

*Ctr. for Biological Diversity v. Haaland*,
58 F.4th 412 (9th Cir. 2023) .......... 27, 29, 32

*Drake v. FAA*,
291 F.3d 59 (D.C. Cir. 2002) .......... 39

*FCC v. Fox Television Stations, Inc.*,
556 U.S. 502 (2009) .......... 12, passim

*FCC v. Prometheus Radio Project*,
592 U.S. 414 (2021) .......... passim

*Fox Television Stations, Inc.*,
556 U.S. .......... 12, passim

*Fraihat v. U.S. ICE*,
16 F.4th 613 (9th Cir. 2021) .......... 51

*Heckler v. Chaney*,
470 U.S. 821 (1985) .......... 36, passim

*Hyatt v. OMB*,
908 F.3d 1165 (9th Cir. 2018) .......... 34

*Jajati v. U.S. CBP*,
102 F.4th 1011 (9th Cir. 2024) .......... 39

*Kerry v. Din*,
576 U.S. 86 (2015) ........ 4, 37

*League of Cal. Cities v. FCC*,
118 F.4th 995 (9th Cir. 2024) ........ 47

*Lincoln v. Vigil*,
508 U.S. 182 (1993) ........ 33, 36, 34

*Lujan v. Nat'l Wildlife Fed'n*,
497 U.S. 871 (1990) ........ 27, 30

*Mobil Oil Expl. & Producing Se. Inc. v. United Distribution Cos.*,
498 U.S. 211 (1991) ........ 55

*Mont. Wildlife Fed'n v. Haaland*,
127 F.4th 1 (9th Cir. 2025) ........ 65

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983) ........ 45

*Nat'l Mining Ass'n v. McCarthy*,
758 F.3d 243 (D.C. Cir. 2014) ........ 33

*Nat'l TPS All. v. Noem*,
166 F.4th 739 (9th Cir. 2026) ........ 64

*Norton v. S. Utah Wilderness All.*,
542 U.S. 55 (2004) ........ 27

*Pacific Gas & Electric Co. v. Federal Power Comm*'n*,*
506 F.2d 33 (D.C. Cir. 1974) ........ 34

*Perez v. Mortg. Bankers Ass'n*,
575 U.S. 92 (2015) ........ 57

*Prutehi Litekyan: Save Ritidian v. U.S. Dep't of the Airforce*,

128 F.4th 1089 (9th Cir. 2025) .......................................................30

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*,
591 U.S. 1 (2020)...............................................................................59

*United States v. Texas*,
599 U.S. 670, 679 (2023)......................................................... 1, passim

*Trump v. CASA, Inc.*,
606 U.S. 831 (2025)........................................................... 6, passim

*Turtle Island v. U.S. Dep't Commerce*,
878 F.3d 725 (9th Cir. 2017)...........................................................24

*United States ex rel. Knauff v. Shaughnessy*,
338 U.S. 537 (1950)...............................................................................1

*United States v. Robertson*,
980 F.3d 672 (9th Cir. 2020)...........................................................24

*Vermont Yankee Nuclear Power Corp. v. NRDC, Inc.*,
435 U.S. 519 (1978)..............................................................................60

## STATUTES

### Immigration and Nationality Act of 1952, as amended:

Section 236(a),
8 U.S.C. § 1226.............................................................................40

Section 236(a),
8 U.S.C. § 1226(a) .......................................................................41

Section 287(a),
8 U.S.C. § 1357(a) .......................................................................41

## Other Authorities:

5 U.S.C. § 701(a)(2) ...................................................... 6, passim

5 U.S.C. § 704 .................................................................... 6, passim

5 U.S.C. § 706 ..........................................................................24

28 U.S.C. § 1291 ..........................................................................7

28 U.S.C. § 1294 ..........................................................................7

28 U.S.C. § 1331 ..........................................................................7

42 U.S.C. § 1983 ..........................................................................5

## INTRODUCTION

It is indisputable that the Executive retains "enforcement discretion over arrests and prosecutions" in "the immigration context"—including whether and how "to remove [aliens] from the United States." *United States v. Texas*, 599 U.S. 670, 679 (2023). That discretion stems from both the Constitution and statutory law. The "exclusion of aliens is a fundamental act of sovereignty," and "the right to do so stems not alone from legislative power but is inherent in the executive power to control the foreign affairs of the nation." *United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 543 (1950). And the discretion which comes with that broad authority serves an important purpose. Managing "inevitable resource constraints and regularly changing public-safety and public-welfare needs" is a "complicated balancing process." *Texas*, 599 U.S. at 680. The Executive's expansive remit in this area provides the flexibility needed to deal with this "constant" "reality." *Id.*

In line with that authority, the agencies tasked with implementing this Nation's immigration policies have long channeled their discretion through informal internal memoranda. These guidance documents serve an important role in providing officers on the ground with details on what

to consider when deciding how to enforce the immigration laws. Although various administrators and administrations have amended guidance and policies over the years, one thing has remained constant: these documents have always preserved the flexibility of agency officials to modulate how they execute the laws.

The agency guidance at the heart of this appeal is the latest iteration in that tradition. In January 2025, a new administration brought with it a renewed focus on immigration enforcement. Defendants issued several guidance documents to align with and implement that vision. In doing so, Defendants emphasized to agency officials the policy to more fully enforce the immigration laws, and also issued guidance to enable them to do so in light of resource constraints.

As to more rigorous enforcement, Defendants issued two documents. *First*, Immigration and Customs Enforcement ("ICE") issued guidance advising its officers to exercise more fulsomely their authority to conduct arrests around courthouses, including immigration courthouses. U.S. Department of Homeland Security ("DHS"), ICE, Civil Immigration Enforcement Actions In or Near Courthouses, Policy Number: 11072.4 (May 27, 2025) ("2025 Courthouse Arrest Guidance");

2-ER-164–66. *Second*, parallel to ICE's guidance, the Executive Office for Immigration Review ("EOIR")—the office which oversees immigration courts—issued guidance of its own, indicating that it was not EOIR policy to impede ICE from conducting immigration courthouse arrests. EOIR, Policy Memorandum 25-06 (Jan. 28, 2025) ("PM 25-06" or "EOIR's Guidance"); 2-ER-219–21. That guidance acknowledged the recent Executive policy changes. *Id.*

Defendants further issued guidance to help ensure that resource constraints would not obstruct the rigorous enforcement of the immigration laws. To that end, ICE issued guidance to provide field offices around the United States with discretion about how long (up to 72 hours) to detain aliens in short-term holding facilities. DHS, ICE, Nationwide Hold Room Waiver (June 24, 2025) ("12-Hour Waiver Guidance"); 2-ER-009–10. That guidance was in response to ICE Enforcement Removal Operations ("ERO") offices across the country requesting waivers of the default 12-hour hold limit (absent exceptional circumstances) set by an earlier Executive Branch directive. As the number of waivers increased across the United States, ICE decided new

guidance was an appropriate response to the shortage in detention space spurred by new Executive policy.

That the current Administration changed course—and issued guidance reflecting that decision—is no anomaly. It is customary at the beginning of *any* new presidential administration to issue such policies. The challenged documents are informal; each memorandum was explicitly internal, and none was promulgated through notice-and-comment or purported to create rights or obligations for anyone. Furthermore, each memorandum concerned the manner of exercising discretionary authority, which no one disputes rests with the Executive as a general matter. These documents are, in other words, unremarkable.

The same cannot be said about this suit. Plaintiffs—individual aliens unlawfully present and seeking relief from removal—commenced this action to challenge these policies. In that suit, Plaintiffs asked the district court to review ICE's advice to its officers on how and whether to arrest or detain removable aliens—even though that advice (which largely defers to the individual officer's judgment) falls within a heartland area of Executive discretion. According to Plaintiffs, each of ICE's and EOIR's guidance at issue fails based on the theory that the

agencies did not consider other factors or the alternative of doing nothing rather than address the problem before them. *Cf.* U.S. Const. art. II §3 (The President "shall take Care that the Laws be faithfully executed.").

Those were extraordinary requests. And the district court indulged them. Under the Administrative Procedure Act ("APA"), the court below vacated all three guidance documents in their entirety nationwide.

That was error, from start to finish. At the start, the district court was wrong to review Plaintiffs' claims at all because the APA bars them. *First*, the challenged guidance documents are not final agency actions, and so the APA provides no vehicle for their review. No alien can say that he or she was arrested *because* of the guidance, which only purported to lift the prior (non-absolute) policy against immigration courthouse arrests. Aliens now are arrested—at immigration courthouses and elsewhere—for the same reason they were ever arrested: when, in the discretion of the arresting immigration officer, it was seen appropriate to do so. *Second*, Plaintiffs' complaint against the 12-Hour Waiver Guidance sounds in a conditions-of-confinement claim under 42 U.S.C. § 1983. With such an obvious alternative remedy available, the APA does not provide a claim for relief. *Third*, the challenged guidance concerns

matters committed to agency discretion. Before and after the challenged guidance, the Executive *always* retained discretion on whether and how to arrest and detain removable aliens in this country. The APA precludes judicial review in these circumstances. 5 U.S.C. §§ 701(a)(2), 704.

Plaintiffs' claims thus should have failed at the threshold. They fare no better on the merits. To conclude otherwise would allow the district court to substitute its own policy judgment for that of the agencies, transforming arbitrary-and-capricious review into an unwarranted judicial straitjacket. The district court criticized ICE and EOIR for not acknowledging the change in their guidance, even though they expressly did so. It accused ICE and EOIR of not considering the alternative of leaving the old guidance in place—as if the APA requires a treatise on inaction every time an agency plans on changing course in line with its policy judgment. And the district court invented a requirement that agencies must engage in a lengthy constitutional discussion before taking any action—even if there is *no constitutional violation* to be found.

Even assuming Plaintiffs' claims are viable (they are not), the relief granted by the district court stretches far beyond what "complete relief" requires. *Trump v. CASA, Inc.*, 606 U.S. 831 (2025). The only parties

before the district court were specifically geographically limited putative classes of removable aliens. Nonetheless, the district court saw fit—with hardly any analysis to support it—to grant nationwide vacatur to Plaintiffs who had no need for it. That too was improper.

This Court should reverse the district court's order vacating the guidance documents at issue in this pending appeal.

## **JURISDICTIONAL STATEMENT**

The U.S. District Court for the Northern District of California had jurisdiction over this matter pursuant to 28 U.S.C. §1331 (federal question jurisdiction), except to the extent it lacked jurisdiction over claims or remedies for the reasons explained in the body of this brief. The district court entered a final judgment on this matter as to Plaintiffs' APA claims on June 30, 2026. 1-ER-002–003; *see also* 1-ER-004–074 (district court's Order Re: Motions for Class Certification and Summary Judgment).

Defendants filed a timely notice of appeal on July 2, 2026. Fed. R. App. P. 4(a)(1)(B); 3-ER-054–55. This Court accordingly has jurisdiction over this case pursuant to 28 U.S.C. §§ 1291 and 1294.

## ISSUES PRESENTED

I. Did the district court err when it reviewed agency action that was not final?

II. Did the district court err when it reviewed Plaintiffs' claims concerning the 12-Hour Waiver Guidance under the APA when they had another adequate remedy available?

III. Did the district court err when it reviewed the challenged guidance documents, which were all committed to agency discretion?

IV. Did the district court err by concluding that the challenged guidance documents are arbitrary and capricious?

V. Did the district court err by issuing nationwide vacatur in a case where the certified class was limited to a specific region?

## STATEMENT OF THE CASE AND RELEVANT FACTS

As the Supreme Court has recognized, the "principle of enforcement discretion over arrests … extends to the immigration context[.]" *Texas*, 599 U.S. at 682. In that field, "the Executive's enforcement discretion implicates not only normal domestic law enforcement priorities but also foreign-policy objectives." *Id.* at 679 (internal quotation marks and

citation omitted). That broad scope of discretion means that "the Executive Branch must prioritize its enforcement efforts." *Id.*

Those prioritization choices are often expressed through the issuance of internal memoranda providing guidance to agency officials as to how to exercise their discretion. For instance, in 1993, the Immigration and Naturalization Service ("INS") issued a memorandum to district directors and chief patrol agents to "attempt to avoid apprehension of persons … on the premises of schools, places of worship, funerals and other religious ceremonies." 2-ER-167. To give another example, in 2013, the Deputy Commissioner of the Customs and Border Protection ("CBP") sent an internal memorandum on conducting enforcement actions at schools, places of worship, community centers, and hospitals. *Id.* at 181.

These memoranda generally share certain characteristics. For one, they are informal and properly issued without notice-and-comment—the better to enable agencies to quickly change course in policy should circumstances impel it. For another, they are internal and are addressed to agency staff and employees. These memoranda do not purport to create or even interpret any law. And they expressly disclaim (even warn against) any reliance interests on the part of private parties. Virtually

every memorandum includes a statement that it "does not affect the scope of authority" of the agency and "does not confer any benefits upon" private parties. *See*, *e.g.*, *id.* at 169.

Finally, and relatedly, these memoranda have never flatly prohibited any particular action, and in fact have preserved agency leeway in enforcement. As the 1993 memorandum stated, it is merely "directed to the operational implementation" of the "authority of [the agency] under the Immigration and Nationality Act," without "affect[ing] the scope" of that authority. 2-ER-169. The purpose of the memorandum was to guide "a uniform exercise of delegated authority"—not to eliminate it. *Id.*

The more recent 2021 "Guidelines for Enforcement Actions in or Near Protected Areas" is of a piece. *Id.* at 192. Those guidelines set out a general policy that ICE "should not take an enforcement action" around schools or medical facilities. *Id.* at 193. But even for that "foundational principle," the memorandum set out six broad circumstances where it should yield to other considerations. *Id.* at 193, 195. And even then, the memorandum emphasized that "[t]his list is not complete," and "the exercise of judgment is required." *Id.* at 195.

Those examples illustrate the point. Immigration agencies have long issued internal memoranda to *guide* enforcement discretion, but never to *supplant* such discretion. Immigration arrests and enforcement have always been exercises of discretion.

## I. COURTHOUSE ARREST GUIDANCE

As mentioned above, over the past few decades, immigration agencies have issued guidance concerning enforcement activities at certain locations. 2-ER-167–182. Prior to 2014, the guidance generally did not explicitly mention or place limits on arrests at courthouses, including immigration courthouses, except for enforcement actions that involved crime victim aliens eligible for certain immigration benefits. *Id.* Even then, that guidance merely required ICE to certify that it had independently verified the removability of such an alien if encountered at certain sensitive locations, including at a courthouse under certain circumstances, and to refrain from permitting any unauthorized disclosure of information concerning the alien. *Id.* at 170, 172-73. The guidance concerning these sensitive locations also did not prohibit enforcement activity; rather, they generally required written

authorization in the absence of exigent circumstances. *Id.* at 167-68, 175, 177, 179-80, 181-82.

These informal memoranda typically called on officers to "exercise good judgment" (*id.* at 168), apply "great care and forethought" and "common sense" (*id.* at 175), and "exercise sound judgment and common sense" (*id.* at 181–82) when making discretionary determinations regarding enforcement activity. They also acknowledged the statutory authority of immigration officers to carry out enforcement functions and disclaimed the creation of any benefits or rights. *Id.* at 169, 172-73, 175, 177, 180-82. Furthermore, because these memoranda were informal, they necessarily could be amended through informal processes as well. *Cf. FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) (noting that the APA "make[s] no distinction … between initial agency action and subsequent agency action undoing or revising that action").

Those memoranda have always reflected the policy judgments of agency leadership. For over a decade, ICE has issued guidance concerning how its agents should engage in civil immigration enforcement actions in or near courthouses. 3-ER-040. In a March 19, 2014, memorandum ICE stated that it would undertake enforcement

actions at or near courthouses only against certain aliens deemed "Priority 1 aliens." *Id.* That category included aliens engaged in or suspected of terrorism and espionage, as well as aliens who posed a serious risk to public safety. *Id.* This memorandum aligned with an ICE Policy that created that category "[i]n light of the large number of administrative violations the agency is charged with addressing and the limited enforcement resources the agency has available." *Id.* (citing ICE Policy No. 10072.1). The "Priority 1 alien" category thus reflected the agency's attempt to "promote the agency's highest enforcement priorities, namely national security, public safety, and border security." *Id.*

After March 2014, ICE revised that guidance to reflect enforcement priorities set forth in then-DHS Secretary Jeh Johnson's November 20, 2014, Memorandum, entitled "Policies for the Apprehension, Detention, and Removal of Undocumented Immigrants." *Id.* at 041. That guidance still permitted enforcement actions at or near courthouses under certain circumstances. *Id.* And it explained that "[q]uestions regarding this guidance may be directed to [a] Field Operations Staff Officer." *Id.*

On January 25, 2017, President Trump issued Executive Order 13,768, *Enhancing Public Safety in the Interior of the United States*,

which expanded the categories of aliens to be prioritized for removal. 82 Fed. Reg. 8799 (Jan. 25, 2017). To implement that Executive Order, on January 10, 2018, ICE issued Directive 11072.1: Civil Immigration Enforcement Actions Inside Courthouses (the "2018 Directive"), which revised ICE's policy "regarding civil immigration enforcement actions inside federal, state, and local courthouses." 2-ER-184–87. The 2018 Directive explained that "civil immigration enforcement actions taken inside courthouses can reduce safety risks to the public, targeted alien(s) and ICE officers and agents," because "[i]ndividuals entering courthouses are typically screened by law enforcement personnel to search for weapons and other contraband." *Id.* In keeping with previous agency guidance in the form of directives or memoranda, the 2018 Directive indicated that it did not create any rights or benefits and explicitly indicated that it could be "modified, rescinded, or superseded at any time without notice." *Id.* at 186.

On January 20, 2021, President Biden issued Executive Order 13,993, *Revision of Civil Immigration Enforcement Policies and Priorities*, 86 Fed. Reg. 7051 (Jan. 20, 2021), which revoked Executive Order 13,768. On the same day, Acting DHS Secretary David Pekoske

issued a memorandum amending the agency's immigration enforcement priorities. 3-ER-043–47. DHS later superseded and revoked the 2018 Directive and issued interim guidance governing [ICE] "civil immigration enforcement actions in or near courthouses" ("2021 Guidance"). 2-ER-188.

The 2021 Guidance, like other guidance documents before it, was informal—circulated among agency employees and not promulgated by notice-and-comment rulemaking. It gave a general policy to refrain from courthouse (including immigration courthouse) arrests. It preserved discretion to deviate from that policy, with exceptions for, among other things, arrests that "involve[] a national security threat," an "imminent risk of death, violence, or physical harm to any person," hot pursuit, or imminent risk of evidence destruction. *Id.* at 189. It provided a catch-all exception for courthouse arrests when "a safe alternative location for such action does not exist or [it] would be too difficult to achieve the [action] at such a location." *Id.* And it included typical language that the guidance (1) "does not … create any right or benefit, substantive or procedural, enforceable at law by any part in any administrative, civil, or criminal matter" and (2) "provides management guidance to ICE and

CBP personnel exercising discretionary law enforcement functions." *Id.* at 190. It also acknowledged it would likely be replaced with final guidance. *Id.* at 188.

On January 20, 2025, President Trump issued two relevant executive orders. The first—Executive Order 14,159, *Protecting the American People Against Invasion*—revoked the prior administration's civil immigration enforcement guidance and priorities and stated that it "is the policy of the United States to faithfully execute the immigration laws against all inadmissible and removable aliens." 90 Fed. Reg. 8443, 8443 (Jan. 20, 2025); 2-ER-011–16. The second—Executive Order 14,165, *Securing Our Borders*—directed agencies to "[d]etain[], to the maximum extent authorized by law, aliens apprehended on suspicion of violating Federal or State law," and to "[r]emov[e] promptly all aliens who enter or remain in violation of Federal law." 90 Fed. Reg. 8467, 8467 (Jan. 20, 2025); 2-ER-017-19.

That same day, the Acting Secretary of DHS issued a memorandum to ICE and CBP, titled "Enforcement Actions in or Near Protected Areas." 2-ER-213. That memorandum rescinded earlier guidance that discouraged arrests in protected areas such as schools, healthcare

facilities, and places of worship. *Id.* According to the Acting Secretary, rescinding that guidance was appropriate because "officers frequently apply enforcement discretion to balance a variety of interests, including the degree to which any law enforcement action occurs in a sensitive location." *Id.* Accordingly, "[g]oing forward, law enforcement officers should continue to use that discretion along with a healthy dose of common sense," and "[i]t is not necessary … for the head of the agency to create bright line rules regarding where our immigration laws are permitted to be enforced." *Id.* The memorandum concluded by inviting ICE "to issue further guidance to assist officers in exercising appropriate enforcement discretion." *Id.*

ICE answered the call. The next day, the Acting ICE Director issued "Policy Number 11072.3" in a Memorandum entitled "Interim Guidance: Civil Immigration Enforcement Actions in or near Courthouses" ("2025 Interim Guidance"). 2-ER-214–18. Shortly thereafter, ICE issued the 2025 Courthouse Arrest Guidance. *Id.* at 164–66.

The 2025 Courthouse Arrest Guidance explains that civil immigration enforcement actions taken inside courthouses "can reduce safety risks to the public, targeted alien(s) and ICE officers and agents,"

because "[i]ndividuals entering courthouses are typically screened by law enforcement personnel to search for weapons and other contraband." *Id.* at 164; *see also* 3-ER-051 (ICE official's declaration post-dating the 2025 Courthouse Arrest Guidance but affirming that "[c]onducting house and street apprehensions presents significant safety risks for officers. Often, house and street arrests require officers and agents to enter high crime and unfamiliar neighborhoods, where there are many variables that cannot be controlled.").

Additionally, civil immigration enforcement actions in or near courthouses are consistent with the actions of "[f]ederal, state and local law enforcement officials" who "routinely engage in enforcement activities in or near courthouses because many individuals appear in courthouses for unrelated criminal or civil violations." 2-ER-164. The guidance further explains that courthouse arrests "are often required when jurisdictions refuse to cooperate with ICE." *Id.*

The 2025 Interim Guidance and 2025 Courthouse Arrest Guidance accordingly do two things. *First*, through a combination of the two, the 2021 Guidance was rescinded entirely, and as such there are no longer recommended restrictions on immigration courthouse arrests. *Second*,

the 2025 Courthouse Arrest Guidance recommended that "ICE officers or agents may conduct civil immigration enforcement actions in or near courthouses when they have credible information that leads them to believe the targeted alien(s) is or will be present at a specific location," while discouraging enforcement actions "within courthouses that are wholly dedicated to non-criminal proceedings." *Id.* at 165. Accompanying these actions was the usual language: the memorandum "provides only internal ICE policy guidance," it "may not be relied upon to create any right or benefit." *Id.* at 166.

Parallel to these developments, EOIR issued PM 25-06 wherein it rescinded its prior guidance regarding immigration courthouse arrests. *Compare* 2-ER 219–21 *with id.* at 228–30. It did so *both* in the interest of responding to ICE's approach, as well as based on its own policy and legal analysis. *Id.* at 219–21. In particular, EOIR no longer agreed with the rationales of the prior guidance, such as fear of a chilling effect on immigration court attendance, "safety risks," and maintaining a separation between EOIR and ICE. *Id.* at 219-20. It also acknowledged that, contrary to the unsupported implication of its prior guidance, EOIR possessed no legal authority to prohibit ICE from taking any action

lawfully authorized by Title 8 of the United States Code. *Id.* at 220. And, as with the 2025 Courthouse Arrest Guidance, the EOIR guidance disclaimed creating "any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States." *Id.* at 220-21.

Notably, like prior ICE memoranda, prior EOIR memoranda addressing courthouse arrests were informal and addressed to staff, did not strictly prohibit arrests at immigration courts, acknowledged circumstances where enforcement actions were necessary, and were subject to reevaluation and modification. *See*, *e.g.*, *id.* at 231–34.

## II. 12-HOUR WAIVER GUIDANCE

During President Biden's Administration, ICE issued Policy Number "11087.2: Operations of ERO Holding Facilities." 2-ER-020–34. That document provides guidelines for ERO's operation of its holding facilities. *Id.* at 020. As relevant, those guidelines provide that "[a]bsent exceptional circumstances, no detainee should be housed in a holding facility for longer than 12 hours." *Id.* at 026. This was consistent with the Performance-Based National Detention Standards ("PBNDS") of 2011 (revised in 2016), which limited an alien's confinement in a hold room for

up to 12 hours, but allowed for the agency to "adopt, adapt or establish alternatives, provided they meet or exceed the intent represented by" the procedures outlined elsewhere in the PBNDS. 3-ER-016.

Following the Trump Administration's restored focus on immigration enforcement, ERO's daily population of detained aliens increased. 2-ER-010. To safely and effectively hold more aliens, ICE and ERO started executing waivers of the 12-hour hold limit for specific field offices around the United States. Each time that a field office requested a waiver, however, there was a lengthy and detailed process of review and approval by several law enforcement and custody specialists. *See generally id.* at 052-96. Each field office requesting a waiver had to specifically describe the waiver at issue and provide support for it. *Id.* In multiple requests, ICE described the failure of state and local law enforcement cooperating with federal law enforcement as one of the reasons why a waiver was needed. *See*, *e.g.*, *id.* at 037 (Maryland), 153 (California).

On June 24, 2025, ICE issued the 12-Hour Waiver Guidance in response to these conditions. *Id.* at 009–10. The 12-Hour Waiver Guidance notes that ERO field offices no longer had the option of

discretionarily releasing aliens or declining to take custody of aliens from other agencies. *Id.* at 010.

Critically, the 12-Hour Waiver Guidance does not require that a field office detain aliens for more than 12 hours. *Id.* at 009-10. Nor does it mandate how long a field office must detain an alien. *See id.* Instead, the 12-Hour Waiver Guidance merely permits detention of relevant aliens "for up to, but not exceeding 72 hours, absent exceptional circumstances." *Id.* at 009.

Under the 12-Hour Waiver Guidance, ICE and ERO remain committed to ensuring the safety and security of detainees. *Id.* at 010. Field offices must follow the existing policies, procedures, and guidance governing holding facilities. *See id.* And detention "shall be … for the least amount of time required" for processing and other functions as "operationally feasible." *Id.*

## III. PROCEDURAL HISTORY

One of the Plaintiffs commenced this action by initially filing a petition for writ of habeas. 1-ER-016–17; ECF No. 1. That Plaintiff later amended her complaint to add several other Plaintiffs. 1-ER-016–17; ECF No. 32. The amended complaint also included class action claims,

and proposed two geographically limited classes. First, Plaintiffs proposed a "courthouse arrest class," defined as "[a]ll persons who have a court hearing in a proceeding on EOIR's non-detained docket in an immigration courthouse in ICE's San Francisco Field Office Area of Responsibility."[1] ECF No. 32 ¶ 170. Second, Plaintiffs proposed a "detention class," defined as "[a]ll persons who are now or will be detained in a holding cell in ICE's San Francisco Field Office." *Id.*

The district court eventually severed the individual habeas claims from the class claims. *Id.* at 017; ECF No. 137. The issues that remained before the district court before its June 23, 2026, Order were Plaintiffs' claims that the challenged guidance documents violated the APA and their constitutional challenge to conditions at ICE's San Francisco Field Office. The district court also granted provisional certification of Plaintiffs' courthouse and detention classes. 1-ER-018; ECF No. 138. And then the district court granted Plaintiffs' motion for preliminary injunction concerning the conditions of confinement at 630 Sansome, and granted a stay of the courthouse arrest policies under Section 705 of the

[1] ICE's San Francisco Office Area of Responsibility encompasses northern California, Hawai'i, Guam, and Saipan. *See* 1-ER-27; ECF No. 32 ¶ 59.

APA within ICE's San Francisco Area of Responsibility. 1-ER-018; ECF No. 138, 155. The district court recognized that a stay limited to the San Francisco Area of Responsibility "afford[s] complete relief to the parties for the demonstrated harms." ECF No. 155 at 38.

Finally, in the appealed order, the district court granted partial summary judgment to Plaintiffs with respect to their APA claims. 1-ER-074. The district court's reasoning largely mirrored its earlier pronouncements at the preliminary stay stage. However, unlike before, the remedy it provided was not limited; rather, it vacated all three guidance documents in their entirety. *Id.* Plaintiffs' constitutional claims concerning conditions of confinement at 630 Sansome remain pending in the district court.

## **STANDARD OF REVIEW**

This Court reviews questions of a district court's subject matter jurisdiction de novo. *United States v. Robertson*, 980 F.3d 672, 675 (9th Cir. 2020). This Court also reviews challenges to allegedly final agency action decided on summary judgment de novo and pursuant to 5 U.S.C. § 706. *Turtle Island v. U.S. Dep't Commerce*, 878 F.3d 725, 732 (9th Cir. 2017).

## SUMMARY OF THE ARGUMENT

"In light of inevitable resource constraints and regularly changing public-safety and public-welfare needs, the Executive Branch must balance many factors when devising arrest and prosecution policies." *Texas*, 599 U.S. at 680. The guidance at issue in this case did just that. The courthouse arrest policy reflects the Executive's decision that the "public-safety and public-welfare needs" of the Nation required more rigorous enforcement of the immigration laws. *Id.* And "inevitable resource constraints" informed the agency's decision to adopt a more relaxed policy as to length of temporary detention. *Id.*

In short, the agencies here did exactly as agencies are wont to do—implement policies and advise their agents in the exercise of their discretion. The district court's order vacating these utterly commonplace and commonsense policies should be reversed. 1-ER-002–074. The district court's vacatur of the guidance was error for several reasons. First, the challenged guidance was not reviewable. None of the guidance documents being challenged in this case were "final agency action" under 5 U.S.C. § 704. They do not obligate agency officers or personnel to take any specific actions, determine any rights or obligations, nor do they

create legal consequences. They simply supply considerations for the Defendant agencies to evaluate when exercising their discretionary authority. Moreover, with respect to the Plaintiffs' claims challenging the 12-Hour Waiver Guidance, Plaintiffs have another adequate remedy available to them, indeed one which they have already utilized with some preliminary success. *Id.* In addition, judicial review is precluded here because all the challenged agency actions are undoubtedly committed to agency discretion by law. *Id.* at § 701(a)(2).

Second, the district court's conclusions concerning the vacatur were inappropriate substitutions of its judgment for that of the agency; ICE's and EOIR's guidance are reasonable and reasonably explained. Each of the guidance documents acknowledged that they were modifying prior guidance, provided a rationale for the change, and the rationales were reasonable; this is sufficient to overcome the arbitrary-and-capricious challenge under the APA. *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021); *Fox Television Stations, Inc.*, 556 U.S. at 515.

Lastly, even if vacatur was warranted (it was not), the district court erred in vacating the challenged guidance nationwide. Under *Trump v. CASA, Inc.*, 606 U.S. 831 (2025), the district court impermissibly

exceeded its authority by awarding relief beyond that which was necessary.

## ARGUMENT

### I. THE DISTRICT COURT LACKED JURISDICTION TO REVIEW PLAINTIFFS' APA CLAIMS

#### A. The Challenged Guidance Are Not Final Agency Action

The APA limits judicial review to "'final agency action.'" 5 U.S.C. §704; *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 61-62 (2004) (citation omitted). Not all agency conduct qualifies as "final agency action" under the APA. *Ctr. for Biological Diversity v. Haaland*, 58 F.4th 412, 417 (9th Cir. 2023). Agency action is final only if it "(1) mark[s] the consummation of the agency's decisionmaking process" and "(2) is one by which rights or obligations have been determined, or from which legal consequences will flow." *Id.* (citation and internal quotation marks omitted). "Day-to-day operations" of federal agencies are generally not considered final agency action, and thus not subject to APA review. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 899 (1990).

Under those principles, there is no "final agency action" for the district court to review. No alien is arrested or detained *because* of the

guidance at issue; aliens, today and yesterday, are arrested or detained when a relevant immigration officer makes that discretionary call. The district court erred in concluding that the challenged policies were final agency actions. 1-ER-038–40.

1. <u>The 12-Hour Waiver Guidance</u>

The 12-Hour Waiver Guidance is not final agency action. The district court held that the guidance is final agency action because it "'mark[s] the consummation of the agency's decisionmaking process' as to the extent of field offices' discretion and 'amounts to a definitive statement of [ICE's] position' about the maximum length of detentions in hold rooms." *Id.* at 040. This conclusion was error.

The 12-Hour Waiver Guidance states that the waiver of the 12-hour hold room utilization time under ICE Directive 11087.2 is a waiver that "allows for aliens … to be housed in a holding facility for up to, but not exceeding, 72 hours, absent exceptional circumstances." 2-ER-009. The 12-Hour Waiver Guidance also acknowledges that the guidance contained therein would remain in effect temporarily and that it was "subject to review, extension, and rescission" at the discretion of the Assistant Director of ICE's Custody and Management. *Id.* Thus, contrary

to the district court's conclusion, the guidance does not amount to any definitive statement about how far a field office's discretion can go or the maximum length of detention in hold rooms, particularly given that it allows for "exceptional circumstances" to ultimately impact the length of a hold.

Moreover, the Guidance does not *obligate* any field office to hold an alien for more than 12 hours. *Id.* at 009–10; *see Ctr. for Biological Diversity*, 58 F.4th at 417. Indeed, on closer inspection, the 12-Hour Waiver Guidance is entirely unexceptional in effect. 2-ER-009–10. It advises field offices to keep detainees in a holding facility "for the least amount of time required for their processing, transfer, release, or repatriation as operationally feasible," *id.* at 010—which of course could be less than twelve hours.

Nor does the 12-Hour Waiver Guidance "mark the consummation of the agency's decisionmaking process." *Ctr. for Biological Diversity*, 58 F.4th at 417. At bottom, the 12-Hour Waiver Guidance has the same effect as ICE merely *allowing* field offices to consider current events to constitute "exceptional circumstances" within the meaning of the earlier guidance. That is not a discrete, identifiable, final agency action.

Plaintiffs' claim is thus the sort of impermissible challenge to the day-to-day operational decisions and conduct that falls far outside the APA's ambit. *Lujan*, 497 U.S. at 899.

The district court rested its holding that the 12-Hour Waiver Guidance constitutes final agency action entirely on this Court's decision in *Prutehi Litekyan: Save Ritidian v. U.S. Dep't of the Airforce*, 128 F.4th 1089 (9th Cir. 2025). 1-ER-040. But that case only confirms that there is no final agency action here. In *Ritidian*, this Court considered whether an agency's filing of a permit application constituted final agency action. *Ritidian,* 128 F.4th at 1107. If that application were granted, the agency made clear that it would proceed with operations to destroy hazardous munitions waste. *Id.* at 1103. That permit application was "final" for purposes of the APA because, by filing it, the agency "reached the consummation of its decisionmaking process" and had a "definitive position" on what it would do once the application was granted. *Id.* at 1107.

By contrast, here, ICE has not made *any* decision on *any* alien's detention when it issued the 12-Hour Waiver Guidance. Far from committing itself to a "definitive" course, *id.*, ICE merely advised its

agents to exercise their discretion to do what is "operationally feasible" with regard to detention times, "for the least amount of time required for their processing, transfer, release, or repatriation as operationally feasible," 2-ER-010. There is nothing final about that advice.

2. <u>ICE Courthouse Arrest Guidance and EOIR Guidance</u>

Neither do the 2025 ICE Courthouse Arrest Guidance and EOIR Guidance constitute final agency actions under 5 U.S.C. §704. The district court held that the 2025 Courthouse Arrest Guidance is final agency action because it "'stat[ed] a definitive position' that ICE agents' discretion to conduct civil arrests at immigration courthouses was no longer subject to any limitations" and that this will "'directly affect the parties[.]'" 1-ER-038–39 (citations omitted). That too was error.

The 2025 Courthouse Arrest Guidance does not contain the "direct[]" effect which the district court strains to find. *Id.* Nowhere does that guidance purport to require any arrests at all. Rather, it flowed from the DHS memorandum that insisted that "law enforcement officers should continue to use" "enforcement discretion … along with a healthy dose of common sense." 2-ER-213. And that discretion, of course, can include the decision *not* to arrest at all. *Texas*, 599 U.S. at 679. Given the

possibilities that can flow from such discretion, the ICE memorandum—notably describing itself as "guidance" that can be "modified, rescinded, or superseded at any time without notice" (2-ER-164, 166)—cannot possibly be the "consummat[e] mark" of the "agency's decisionmaking process" nor does it definitively determine rights or obligations for anyone. *Ctr. for Biological Diversity*, 58 F.4th at 417. It is simply wrong for the district court to suggest that the guidance "directly affect[ed]" Plaintiffs based on their "arrests at immigration court." 1-ER-039.

The district court's conclusions regarding EOIR's Guidance are similarly misguided and amount to error. *Id.* at 039–40. The district court concluded that "[a] written assessment of an agency's authority to take certain action, like EOIR's determination that it lacks statutory or other legal authority to restrict ICE enforcement activities" amounts to final agency action given its "'definitive' nature and 'immediate effect' in permitting ICE agents' courthouse arrests." *Id.* at 040 (citations omitted). But like the 2025 ICE Courthouse Guidance, the EOIR Guidance does not compel any action, determine any rights or obligations, or create legal consequences for aliens who may be the subject of civil enforcement actions. *Ctr. for Biological Diversity*, 58 F.4th at 417. Indeed, the EOIR

Guidance specifically says that "[n]othing herein should be construed as mandating a particular outcome in any specific case." 2-ER-221.

Both documents govern situations in which the government has *always* had the undisputed authority to act. The guidance documents in this case are general statements of policy—that is, a statement "issued by an agency to advise the public prospectively of the manner in which the agency proposes to exercise a discretionary power." *Lincoln v. Vigil*, 508 U.S. 182, 196–97 (1993) (citation and internal quotation marks omitted); *accord Nat'l Mining Ass'n v. McCarthy*, 758 F.3d 243, 251 (D.C. Cir. 2014) (noting that general statements of policy are not subject to pre-enforcement judicial review). Indeed, these documents are explicitly *internal*, and addressed to agency employees. *See* 2-ER-164 (addressed to "All ICE Employees"); 2-ER-219 (addressed to "All of EOIR").

Under these guidance documents, a final agency action would exist only when an immigration officer actually exercised his discretion and arrested a specific individual alien, thereby taking action that determines that alien's rights and obligations. But, standing alone, these documents cannot be reviewed under the APA at this time. *See Nat'l Mining Ass'n*, 758 F.3d at 253; *Pac. Gas & Elec. Co. v. Fed. Power*

*Comm'n*, 506 F.2d 33, 38 (D.C. Cir. 1974) (an agency applying a general statement of policy in a particular situation "must be prepared to support the policy just as if the policy statement had never been issued").

### B. Plaintiffs Have Another Remedy Available for the Waiver Claim

The APA limits judicial review to "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. §704. An adequate alternative remedy in a court exists where "a legal remedy under the APA would impermissibly provide for duplicative review." *Hyatt v. OMB*, 908 F.3d 1165, 1173 (9th Cir. 2018) (citation and internal quotation marks omitted). In assessing whether such a remedy exists, courts should consider whether the statutory scheme "provides a forum for adjudication, a limited class of potential plaintiffs, a statute of limitations, a standard of review, and authorization for judicial relief." *Id.* (citation and internal quotation marks omitted).

Even assuming that the challenged 12-Hour Waiver Guidance is final agency action (it is not), Plaintiffs have another adequate remedy in court for their alleged injuries: they can pursue conditions of confinement claims to improve specific conditions at 630 Sansome Street and to eliminate the alleged constitutional violations allegedly caused by the 12-

Hour Waiver Guidance—and in fact they have done so with some preliminary success. 1-ER-018. In this regard, Plaintiffs' conditions of confinement claims have a forum for adjudication (district court), a limited class of potential plaintiffs (aliens detained at 630 Sansome), a standard of review (deliberate indifference, among others), and authorization for judicial relief (a Court's order to modify conditions).

The district court suggested that such a claim does not provide an adequate remedy because it is based on "constitutional protections against punitive civil confinement," and not the supposedly "precisely drawn, detailed" strictures of the APA. 1-ER-047. Even if that is true as to *some* APA claims, it is not true as to Plaintiffs, whose APA claim as to the 12-Hour Waiver Guidance is completely derivative of their constitutional claims. Indeed, the district court's own reasoning proves the point. According to the district court, *see infra*, the 12-Hour Waiver Guidance violates the APA because the agency did not discuss the "constitutional protections" which the district court derides as being too "broad" to provide an adequate remedy, 1-ER-047. By the district court's own reasoning, the APA provides no more "precisely drawn" or "detailed" protection than the Constitution itself. *Id.*

To be clear, as set out below, Defendants contest that the APA requires a constitutional discussion section for every informal guidance document. But the fact that the district court seizes on the lack of such discussion simply goes to show that the APA claim here is derivative of a different kind of claim altogether. And where there is such an alternative route to court available, the APA provides no additional outlet. 5 U.S.C. §704. Accordingly, the 12-Hour Waiver Guidance is not reviewable under the APA. 5 U.S.C. §704.

### C. The Challenged Guidance is Not Reviewable Because it is Committed to Agency Discretion

The APA also precludes judicial review where the "agency action is committed to agency discretion by law." 5 U.S.C. §701(a)(2); *Lincoln*, 508 U.S. at 190-91. "[E]ven where Congress has not affirmatively precluded review, review is not to be had if the statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." *Heckler v. Chaney*, 470 U.S. 821, 830 (1985).

Notably, a principal feature of the removal system is the broad discretion exercised by immigration officials. *Arizona v. United States*, 567 U.S. 387, 396 (2012). Policy decisions, including a decision to waive an internal guidance or where to carry out an arrest, is grounded in the

Executive Branch's "broad power over the creation and administration of the immigration system," *Kerry v. Din*, 576 U.S. 86, 106 (2015) (Kennedy, J., concurring in judgment).

1. The 12-Hour Waiver Guidance

The district court erred when it concluded that the 12-Hour Waiver Guidance was not committed to agency discretion under §702. 1-ER-043–45. At issue in this litigation is ICE's discretionary decision to waive internal guidance for a limited time in response to the President's declaration of a national emergency and two Executive Orders.

Contrary to the district court's ruling, there is no law to apply about how long aliens should be generally held in a holding facility and when such general guidelines could be waived. The Court's reference to the PBNDS is unavailing. 1-ER-043–44. First, the 2011 PBNDS, which admittedly limits a detainee's confinement in a hold room for more than 12 hours, nevertheless allows the agency to modify that requirement in its discretion provided that the agency's modifications "meet or exceed the intent represented by" the PBNDS procedures. 3-ER-016. Implementing guidance does just that, as the district court itself acknowledged, by allowing aliens to be held for more than 12 hours in

"exceptional circumstances," (1-ER-044; 2-ER-021, n.3) a phrase which provides no "meaningful standard" for a court to review. Similarly, the district court acknowledged that Policy Number 11087.2, "Operations of ERO Holding Facilities," allowed aliens to be held for more than 12 hours in "exceptional circumstances." 1-ER-044. In fact, the district court's vacatur of the 12-Hour Waiver Guidance would not impede ICE's discretionary decision to hold aliens longer than 12 hours based on exceptional circumstances.

The district court's reliance on an outdated INS policy from 2000, *id.* at 043, n.63, fares no better. This policy, which predates the current PBNDS—issued in 2011 and revised in 2016—cannot adequately serve as a "meaningful standard by which [it] may review" ICE's lawful exercise of discretion. *Id.* (citation omitted). ICE has long since modified what was in the 2000 INS policy. That modification itself is evidence that policies and standards that could easily be rescinded or changed are insufficient to serve as a meaningful standard by which a court can review the relevant discretionary decisions. It is hardly "substantive legal criteria against which an agency's conduct can be seriously

evaluated." *Drake v. FAA*, 291 F.3d 59, 70 (D.C. Cir. 2002); *see also Heckler,* 470 U.S. at 830.

Notably, the district court cited *ASSE Int'l, Inc. v. Kerry*, 803 F.3d 1059, 1069 (9th Cir. 2015), to support its reliance on prior policies as the meaningful standard. 1-ER-042. But there this Court reviewed an agency's exercise of discretion against the agency's own *regulations* which carry the force of law—not informal, internal guidance. The district court also relied on *Jajati v. U.S. CBP*, 102 F.4th 1011 (9th Cir. 2024). 1-ER-041–43. But the *Jajati* court did not look to an agency's "prior policies" to provide the "meaningful standard for review." Instead, it judged the agency's exercise of discretion against the "meaningful standards" found in related statutes and regulations. *Jajati*, 102 F.4th at 1018.

The district court, for its part, never provides a theory for what meaningful standards might govern a capacious term like "exceptional circumstances." 1-ER-044–45. Rather than dispute that there *are* no exceptional circumstances here, the district court criticizes the 12-Hour Waiver Guidance for not "invok[ing]" that term. *Id.* at 045. That is irrelevant. The prior policy allowed detentions exceeding 12 hours in

"exceptional circumstances"; there is no requirement for the agency or any official to quote that language before exercising that discretion.

It is also wrong. The district court's conclusion that "nothing in the memorandum announcing the waiver suggests that ICE understood the 12-hour detention waiver to be [an exceptional circumstance]" is belied by the 12-Hour Waiver Guidance's contents. 1-ER-044–45. That guidance document explicitly states that it was issued in response to the President's declaration of a *national emergency* and two Executive Orders. 2-ER-009–10. The 12-Hour Waiver Guidance also cites to the increase in enforcement efforts following the declaration and the Executive Orders, which severely impacted ICE's ability to detain aliens per its authority under 8 U.S.C. §1226. *Id.* It is not difficult to imagine these circumstances as "exceptional circumstances," and the district court had no judicially manageable standard to conclude otherwise.

Finally, the district court suggests that, if "exceptional circumstances" exist, there was no need for Defendants to issue the 12-Hour Waiver Guidance at all. 1-ER-045. That demonstrates an unrealistic vision of Executive Branch operation. Even if every individual officer could independently conclude that "exceptional circumstances"

exist, a document like the 12-Hour Waiver Guidance serves a useful coordinating function. Regardless, there is no merit to the district court's theory that, if the 12-Hour Waiver Guidance is superfluous, that alone is a reason to vacate it. Congress frequently employs a "belt and suspenders approach" when it enacts statutes. *Atl. Richfield Co. v. Christian*, 590 U.S. 1, 14 n.5 (2020). There is nothing wrong with executive agencies doing the same.

2. ICE Courthouse Arrest Guidance and EOIR Guidance

The district court similarly erred in concluding it had authority to review the 2025 ICE Courthouse Arrest Guidance and PM 25-06. With respect to the former, the Immigration and Nationality Act ("INA"), from which ICE's arrest authority derives, leaves open to ICE's discretion when and where to enforce the INA's detention provisions. 8 U.S.C. §§1226(a), 1357(a). Thus, there is no "meaningful standard" by which a court can evaluate the appropriateness of ICE's discretionary choice of public locations for targeted immigration enforcement actions. *Heckler*, 470 U.S. at 830; *see* 5 U.S.C. §701(a)(2). And that is unchanged by ICE's subsequent guidance. Indeed, the 2021 guidance made clear that it merely "provides management guidance to ICE and CBP personnel

exercising discretionary law enforcement functions and does not affect the statutory authority of ICE or CBP employees." 2-ER-190. The same goes for the 2025 Courthouse Arrest Guidance that supplanted it, which places "no limitations" on "the otherwise lawful enforcement or litigative prerogatives of ICE." *Id.* at 166.

In short, the decision whether to conduct courthouse arrests has always been in the discretion of ICE, and outside of any court's review. And given EOIR's decision to parallel ICE's guidance to a certain degree, the same goes for PM 25-06. There is no "meaningful standard against which to judge the agency's exercise of discretion" in this matter. *Heckler*, 470 U.S. at 830.

While the district court cited ICE and EOIR's prior policies governing courthouse arrests as meaningful standards by which the Court could evaluate the challenged guidance, it relied on case law where the courts judged the agency's exercise of discretion against standards found in related statutes and regulations, not prior guidance documents perpetually subject to change. 1-ER-041–43. Similar to the reasons discussed above, the district court's reliance on these prior policies as "meaningful standards" was error. Regardless, as also mentioned earlier,

those prior policies never purported to disclaim discretion to conduct courthouse arrests. *See* 2-ER-190 (guidance "does not affect [ICE's] statutory authority" and merely advises on "discretionary law enforcement functions"). And even on its terms the 2021 Guidance is no rigid rule against courthouse arrests, with exceptions phrased in terms that defy "meaningful standards" as well. *See, e.g.*, *id.* at 189 (exception for "national security threat," "imminent risk of death, violence, or physical harm to any person," and for when there is no "safe alternative location" and it "would be too difficult to achieve the enforcement action at such a location").

The district court never explained how the 2021 Guidance so cabined agency official discretion such that there was a "meaningful standard" to apply in the 2025 Courthouse Arrest Guidance. 1-ER-043. Rather, the district court changed gears to criticize the latter as an "irrational departure" from the prior guidance. *Id.* That argument is incorrect, but it is also premature. Whether the 2025 Courthouse Arrest Guidance is "irrational" goes to whether it is arbitrary-and-capricious. But the district court never explained what *standard* to apply in

determining whether that guidance was irrational. Without such a standard, Plaintiffs' APA claims fail at the threshold.

From the start, ICE has had the discretion to conduct courthouse arrests or to refrain from doing so that is not reviewable under the APA. In no guidance has it ever given that up. There the district court did not have jurisdiction to review Plaintiffs' APA claims in this regard. 5 U.S.C. §701(a)(2); *Lincoln*, 508 U.S. at 190-91.

## II. THE CHALLENGED GUIDANCE IS NOT ARBITRARY AND CAPRCIOUS

The arbitrary-and-capricious standard is "deferential, and a court may not substitute its own policy judgment for that of the agency." *Prometheus Radio Project*, 592 U.S. at 423. An agency action need only "be reasonable and reasonably explained." *Id.*

The same goes for a change in agency position. While the agency must demonstrate that there are good reasons for the new policy (as with any policy), "it need not demonstrate to a court's satisfaction that the reasons for the new policy are better than the reasons for the old one; it suffices that the new policy is permissible under the statute, that there are good reasons for it, and that the agency believes it to be better, which the conscious change of course adequately indicates." *Fox Television*

*Stations, Inc.*, 556 U.S. at 515.

And—again—such changes are utterly commonplace in this country's system of government. "A change in administration brought about by the people casting their votes is a perfectly reasonable basis for an executive agency's reappraisal of the costs and benefits of its programs and regulations." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 59 (1983) (Rehnquist, J., concurring in part). "As long as the agency remains within the bounds established by Congress, it is entitled to assess administrative records and evaluate priorities in light of the philosophy of the administration." *Id.* (footnote omitted).

That is what happened here. No one disputes that the agencies in question have the *authority* to arrest and detain removable aliens. Plaintiffs' complaints largely boil down to disagreement with the Administration's change in policy. That is not the sort of disagreement the APA is designed to redress, and the district court erred in concluding otherwise.

### A. The 12-Hour Waiver Guidance is Not Arbitrary and Capricious

The 12-Hour Waiver Guidance was reasonable and reasonably explained. As the Guidance explained, "increased enforcement efforts"

resulted in ICE's ERO field offices' average daily population increasing "to over 54,000." 2-ER-010. That increase "put additional strain on finding and coordinating transfers of aliens to available beds within" the ordinary timelines. *Id.* Holding periods longer than 12 hours thus became necessary "[t]o accommodate appropriately housing the increased number of detainees while ensuring their safety and security and avoid violation of holding facility standards and requirements." *Id.* And the guidance was narrowly tailored: it continued to require field offices to hold detainees only "for the least amount of time required." *Id.*

The district court held that the 12-Hour Waiver Guidance was arbitrary and capricious for three reasons. Each of these reasons fails. First, the district court held that ICE failed to adequately consider alternatives. 1-ER-062. In particular, the district court suggests that ICE should have decided simply to arrest less people. *Id.* That is wrong on fact and law.

Start with facts. For one, contrary to the district court's finding (1-ER-062–63), ICE considered alternatives before deciding to waive the 12-hour limit. 2-ER-010. The 12-Hour Waiver Guidance states that under presidential policies, ERO field offices lacked the authority to

"discretionarily release aliens" and to "decline to take aliens into custody from our counterparts in Homeland Security Investigations (HSI) or [CBP]." *Id.* By expressly rejecting that option, ICE and ERO necessarily *considered* it. For another, to the extent the district court suggests that doing *nothing* (i.e., continuing with the prior policy) was an alternative that had to be considered, it beggars belief that ICE or ERO had not considered what was their reality for years while formulating their new guidance.

As to law, the district court misconceives the APA requirement to consider alternatives. ICE is not required "to consider alternative solutions that did not address the problem it had identified." *League of Cal. Cities v. FCC*, 118 F.4th 995, 1018 (9th Cir. 2024). As the 12-Hour Waiver Guidance made clear, it is not a standalone decision. It is part of government-wide efforts to implement the President's executive orders to prioritize immigration enforcement. 2-ER-009–10. As noted above, ICE did consider discretionary release and like similar alternatives, but the APA does not require ICE to weigh options that would sabotage its objectives.

The district court's suggestion that ICE could simply have arrested

less people is little more than a substitution of its own policy preferences (to arrest less people) for that of the agency's (to zealously enforce this nation's immigration laws), dressed in APA garb. That was error. *See Prometheus Radio Project*, 592 U.S. at 423.

Second, the district court held that the 12-Hour Waiver Guidance was inconsistent with existing ICE policy. 1-ER-063–64. This could not be further from the truth. While the 2011 PBNDS (revised in 2016) prohibited the detention of an alien in a hold room for more than 12 hours, it allowed the agency to exercise its discretionary authority to "adopt, adapt, or establish alternatives" to that limitation so long as the modifications "meet or exceed the intent represented by these procedures." 3-ER-016.

Additionally, as acknowledged in the district court's opinion, implementing guidance allowed aliens to be held in a holding facility for more than 12 hours in "exceptional circumstances." 1-ER-044; *see also* 2-ER-021, n.3. The district court concluded that "*nothing* in the memorandum announcing the 12-hour detention waiver suggested that the waiver was based on any 'exceptional circumstances.'" 1-ER-064 (emphasis added). On the contrary, ICE temporarily issued the

12-Hour Waiver Guidance in response to the new administration's Executive Orders and declaration of a national emergency, which significantly impacted ICE's ability to carry out its daily operations. 2-ER-009–10.

Those *are* exceptional circumstances; the APA supplies no license to usurp the Executive's prerogative to conclude as much, especially given that ICE is best positioned to assess its own operational needs related to detention capacity in light of a changing landscape in immigration enforcement and removal and its resulting impact on detention capacity. ICE's prior and existing policies contemplate situations where aliens might be held in a holding facility longer than 12 hours, and the 12-Hour Waiver Guidance confirms that it was issued for one of those situations. 2-ER-009–10, 021, n.3; 3-ER-016, 029. As such, the 12-Hour Waiver Guidance is consistent with ICE's prior and existing policies.

Third, the district court criticized the Guidance for not "engag[ing] in reasoned consideration of its obligation to avoid creating punitive conditions of confinement." 1-ER-065. Notably, the district court never says the Guidance actually does violate the Fifth Amendment, only that

the Guidance erred by not discussing it. *Id.* But there is no APA obligation to write a treatise on every conceivable constitutional issue that could arise. *See Fox TV Stations*, 556 U.S. at 526 (rejecting dissenters' argument that "the Commission failed adequately to explain its consideration of the constitutional issues inherent in its regulation"). The notion that an agency action might be vacated "not for violating [the Supreme Court's] cases, but for failure to discuss them adequately" is a notion foreign to administrative law. *Id.* If the district court believes that the 12-Hour Waiver Guidance violates the Constitution, it should say so; there is no warrant to require the agency to produce a student note on the topic.

Of course, the district court cannot say that the 12-Hour Waiver guidance is unconstitutional, because it cannot. The 12-Hour Waiver Guidance states that the waiver of the 12-hour limit is "[t]o accommodate appropriately housing the increased number of detainees while ensuring their safety and security and avoid violation of holding facility standards and requirements." 2-ER-010 (emphasis added). The 12-Hour Waiver Guidance also orders field offices to hold aliens for the "for the least amount of time required for their processing, transfer, release, or

repatriation as operationally feasible." *See id.* The 12-Hour Waiver Guidance additionally requires that "[a]ll other hold room and hold facilities requirements continue to apply to ensure the safety, security and humane treatment of those in custody in hold rooms and hold facilities." *Id.* (emphasis added). By its own terms, the Guidance does not proscribe custody that "could be accomplished [by] … alternative and less harsh methods." *Fraihat v. U.S. ICE*, 16 F.4th 613, 647 (9th Cir. 2021). The agency thus did consider its constitutional obligations, and has met them.

### B. The ICE Courthouse Arrest Guidance is Not Arbitrary and Capricious

ICE provided a reasonable rationale for why the prior guidance was rescinded. It expressed its alignment with the overall DHS policy to allow "law enforcement officers [to] continue to use [their] discretion along with a healthy dose of common sense," 2-ER-213, a policy that necessarily entails rescinding anything even resembling "bright line rules regarding where [the] immigration laws are permitted to be enforced," *id.* The 2025 Courthouse Arrest Guidance explained that civil immigration enforcement actions taken inside courthouses "can reduce safety risks to the public, targeted alien(s) and ICE officers and agents," because

"[i]ndividuals entering courthouses are typically screened by law enforcement personnel to search for weapons and other contraband." 2-ER-164. This aligns with an ICE official's declaration post-dating the 2025 Courthouse Arrest Guidance, which stated that "[c]onducting house and street apprehensions presents significant safety risks for officers. Often, house and street arrests require officers and agents to enter high crime and unfamiliar neighborhoods, where there are many variables that cannot be controlled."). 3-ER-051. The guidance further reasonably explained that courthouse arrests "are often required when jurisdictions refuse to cooperate with ICE." 2-ER-164. These rationales were reasonable and were sufficient to overcome the arbitrary and capricious claim. *Prometheus Radio Project*, 592 U.S. at 423; *Fox Television Stations, Inc.*, 556 U.S. at 515.

Most of the district court's criticism of the 2025 Courthouse Arrest Guidance can be traced to its belief that the Guidance does not address immigration courthouse arrests. 1-ER-051. The district court believes that is the case because—as ICE explained in internal guidance, 3-ER-052, the 2025 memorandum's guidance on courthouse arrests (*e.g.*, the direction to generally refrain from conducting arrests in non-criminal

courthouses) do not apply to immigration courthouses. And because the Guidance also rescinds the prior limitations on courthouse arrests, that means there are “no restrictions whatsoever on ICE agents’ civil enforcement actions at immigration courthouses.” 1-ER-051. And so, as the district court sees it, the agency’s decision must be arbitrary and capricious. *Id.* at 051-52.

The problem with the district court’s reasoning is that every one of the steps described above was supported and explained by the agency. Start with the rescission of the earlier guidance. ICE explained that rescission as “[i]n accordance with” a memorandum from the acting DHS Secretary issued the day before. 2-ER-214. And that memorandum took a clear stance: “[O]fficers frequently apply enforcement discretion to balance a variety of interests, including the degree to which any law enforcement action occurs in a sensitive place.” *Id.* at 213. “Going forward, law enforcement officers should continue to use that discretion along with a healthy dose of common sense,” and it was “not necessary” for “the head of the agency to create bright line rules regarding where our immigration laws are permitted to be enforced.” *Id.* That memorandum thus set the general policy and allowed that ICE “may

wish to issue further guidance to assist officers in exercising appropriate enforcement discretion." *Id.*

The rescission—and the subsequent broad remit of ICE agents to conduct immigration courthouse arrests—was thus amply explained. The agency made the decision that, in enforcing immigration laws in immigration courthouses, its agents should be guided by their individual "discretion along with a healthy dose of common sense"—not by internal memoranda. *Id.* And though ICE provided additional explanation to justify further guidelines as to *other* courthouses, the rescission and accompanying explanation makes clear that its treatment of immigration courthouses is the default, not the exception.

With a proper understanding of the 2025 Courthouse Arrest Guidance, the district court's criticisms falter. The district court began by accusing ICE of failing to display awareness that it is changing position. 1-ER-051. But that is belied by the 2025 Interim Guidance, which *explicitly* rescinded the earlier guidance *in its very first paragraph*. 2-ER-214. Moreover, that rescission decision was directly tied to the DHS memo, issued a day before, urging agencies to allow their "law enforcement officers [to] continue to use [their] discretion along with a

healthy dose of common sense" in determining "the degree to which any law enforcement action occurs in a sensitive location." *Id.* at 213-14. It is the district court which failed to acknowledge the agency's explanation.

And to the extent the district court's criticism is that the agency's explanation was expounded in three documents, there is no basis in the APA for requiring ICE to have issued its guidance and explanation in a different form. Agencies "enjoy[] broad discretion in determining how best to handle related, yet discrete, issues in terms of procedures and priorities." *Mobil Oil Expl. & Producing Se. Inc. v. United Distribution Cos.*, 498 U.S. 211, 230 (1991) (citations omitted). Together, the DHS memo, the interim guidance, and the May guidance documents fully lay out ICE's vision for its agents' arrest discretion.

Neither does it make sense to criticize ICE for not discussing "the impact of widespread arrests on the functioning of immigration courts" or the potential "chilling effect" on courtroom attendance. 1-ER-051–52. For one, the Guidance does not create a quota for immigration courthouse arrests—it simply emphasizes that law enforcement officers must use their discretion in determining whether to conduct them. The

"widespread" characterization is the district court's own invention (and telling pejorative). 1-ER-005, 051, 058.

For another, ICE's decision recognized that the point of emphasizing individual officer's enforcement discretion is "to balance a variety of interests," 2-ER-213—including any putative effect on the functioning of immigration courts. And ICE *did* encourage its officers to "conduct civil immigration enforcement actions against targeted aliens discreetly to minimize their impact on court proceedings" as to other courthouses. *Id.* at 215. ICE thus did take into account the impact arrests would have on courts, including immigration courts, when it rescinded the 2021 guidance.

It is inappropriate to require anything more before rescinding the 2021 guidance—especially considering that the 2021 guidance itself is sparse on details for its concern about chilling effects. That guidance says merely that '[e]xecuting civil immigration enforcement actions in or near a courthouse may chill individuals' access to courthouses and, as a result, impair the fair administration of justice." 2-ER-188. The 2025 Courthouse Arrest Guidance is at least as detailed as the 2021 guidance. And nothing more can be required before rescission. The APA "makes no

distinction … between initial agency action and subsequent agency action undoing or revising that action." *Fox Television Stations, Inc.*, 556 U.S. at 515. It requires no more detailed explanation to *rescind* the 2021 guidance than the 2021 guidance itself provided. *See also Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 101 (2015).

### C. EOIR's Guidance is Not Arbitrary and Capricious

Similar to ICE's 2025 Courthouse Arrest Guidance, EOIR's Guidance "articulated a satisfactory explanation for its action." *Fox TV Stations,* 556 U.S. at 513.

Just as ICE's 2025 Courthouse Arrest Guidance did, PM 25-06 explains why it was issued and why the prior policy, Operating Policies and Procedures Memorandum ("OPPM") 23-01, was ineffective. It announced its decision to rescind OPPM 23-01 immediately as its purpose in the header and proceeds to offer a detailed analysis on why OPPM 23-01 was "unpersuasive, inconsistent with current Executive Branch policy, pretextual" and "unsubstantiated." 2-ER-219. For example, PM 25-06 questions OPPM 23-01's alleged "chilling effect" arrests at immigration courts could have on aliens, citing to its vague description, and disputes—with statistics—OPPM 23-01's assertions

that aliens would be discouraged from appearing for their hearings because of such arrests. *Id.* PM 25-06 further questions OPPM 23-01's concerns about safety and argues that enforcement actions at courthouses are safer. *Id.* at 220. PM 25-06 additionally criticizes the motivation behind OPPM 23-01 and explains why OPPM 23-01 was inconsistent with respect to its purported interest in ensuring "the separate and distinct roles of DHS and [EOIR] in the eyes of the public. *Id.* PM 25-06 also recognized the prior guidance's failure to provide legal authority for its prohibition on ICE making Title 8 civil arrests, and "from conducting any action it is otherwise lawfully authorized to take." *Id.*

In light of its other conclusions, the district court declined to resolve the parties' dispute over this last basis, though it insinuated that EOIR could prohibit ICE arrests through the issuance of regulations. 1-ER-055, n. 95. However, the district court neither analyzed nor cited DHS's statutory arrest authorities, identified any statutory authority for EOIR to prohibit the exercise of those DHS statutory authorities, nor explained how a regulation issued by EOIR would countermand DHS's arrest authority in Title 8. In short, the district court could conclude PM 25-06 was arbitrary and capricious only by refusing to engage with it.

The district court also concluded, *inter alia*, that PM 25-06 was arbitrary and capricious because in its view, that policy was based on the false premise that ICE had validly rescinded its 2021 Courthouse Arrest Guidance. *Id.* at 055. The district court reasoned that since it had concluded ICE's 2025 Courthouse Arrest Guidance was arbitrary and capricious, ICE had in fact not validly rescinded the 2021 guidance, thus rendering PM 25-06 arbitrary and capricious. *Id.* But, as argued above, the district court erred in coming to this conclusion concerning ICE's 2025 Courthouse Arrest Guidance.

The district court also concluded that PM 25-06 was arbitrary and capricious because it "failed to understand the scope of its discretion even under its own view of the relevant circumstances." *Id.* at 056 (citing to *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 19 (2020)). The district court faulted EOIR for not considering whether to *completely* follow the same approach as ICE, rather than lift all limits on civil enforcement actions. *Id.* at 057. The district court appears to believe EOIR was obligated to consider that alternative. *Id.* at 056–57.

But that ignores that EOIR had two independent reasons of its own to rescind *all* limits in their entirety. EOIR explained that "there is no

basis to retain" its prior guidance "*especially* in light of DHS's Interim Guidance," 2-ER-220 (emphasis added), but not *only* in light of that development. And the agency's view that its prior foray into adding extra hurdles to civil enforcement actions was based on "incoherent," "unsubstantiated," and "wholly disingenuous" grounds provides reason enough for EOIR to wash its hands clean of the whole matter. *Id.* at 219–220. Regardless, EOIR was not required to discuss "every alternative device and thought conceivable by the mind of man." *Vermont Yankee Nuclear Power Corp. v. NRDC, Inc.*, 435 U.S. 519, 551 (1978). That EOIR has not included a treatise on every one of the district court's theories is no reason to send it back to the drawing board.

The district court's other criticisms of PM 25-06 prove only that the district court has a different view of the evidence than the agency. The district court, without any empirical evidence, first suggests that even aliens with valid claims to legal immigration status would be dissuaded from showing up to immigration court by the possibility of wrongful arrest. 1-ER-058. Yet, that conclusion defies logic; such an alien's failure to appear would mean both (1) the abandonment of a meritorious claim that would allow the alien to lawfully remain in the United States and

have a potential path to American citizenship and (2) a guaranteed removal order. EOIR could reasonably infer that no rational alien would choose these options. The conclusion also defies EOIR's considered experience. Even if the district court's fallacious reasoning had more support, EOIR can permissibly observe that any chilling effect would have less impact on aliens with meritorious claims, and that is a reasonable factor to consider in deciding what should be included in courthouse-arrest guidance.

The district court also faulted EOIR for considering evidence that over 530,000 aliens failed to attend their scheduled hearings even *with* a solicitous courthouse-arrest policy, because "[m]ultiple factors *could* independently affect" their "participation in removal proceedings." *Id.* at 059 (emphasis added); *see also* 2-ER-220. The conditional and vague nature of that observation makes it impossible to verify, but even if it were true, it actually supports EOIR's point in issuing PM 25-06. OPPM 23-01's concerns about ICE arrests "chilling" or "disincentivizing" aliens from appearing were wholly unsubstantiated because, among other reasons, OPPM 23-01 also did not account for potential other factors either. *Id.* at 219–20. Consequently, its failure to do so would have

further justified PM 25-06's decision to rescind it, according to the district court's logic.

Moreover, PM 25-06 includes the eminently reasonable inference that the marginal impact of rescinding the prior guidance would be lower in these circumstances than if the number of delinquent aliens were near zero. To be clear, the APA does not require EOIR or any other agency to "conduct its own empirical or statistical studies" *at all* "before exercising [their] discretion." *Prometheus*, 592 U.S. at 427. It certainly cannot be reason to vacate an agency action that the district court harbors quibbles with a commonsense inference supported by data. Based on the foregoing, PM 25-06 is not arbitrary and capricious, and does not violate the APA.

### D. No Formal Procedure Was Required to Rescind the Challenged Guidance

Aside from the above, the agencies' chosen mode of decision-making confirms that no more formal procedure was required to rescind the challenged guidance. ICE and EOIR adopted the challenged guidance through memoranda—not through notice-and-comment rulemaking, adjudication, or any other formal process. It follows that the agencies could rescind the challenged guidance through the same informal means.

Indeed, *Fox TV Stations* makes clear that an agency's decision to

change course is governed by the requirement of reasoned decision-making, not by a heightened procedural requirement simply because the agency is changing an existing policy. 556 U.S. at 514-16. If the agencies were entitled to establish the challenged policies through informal memoranda in the first instance, nothing in the APA or in *Fox TV Stations* required them to invoke a more elaborate procedure to undo what they had done. So long as the agencies adequately acknowledged the change and supplied a reasoned explanation for it, which they did, rescission by memorandum was sufficient. *Id.* For decades, the agencies have adopted, altered, and rescinded policies on these subjects through informal memoranda. The only difference here appears to be the administration issuing the policies; that is an insufficient reason to impose novel requirements on the Defendant agencies. This Court should reverse.

## III. THE DISTRICT COURT ABUSED ITS DISCRETION IN ISSUING A NATIONWIDE VACATUR

Despite the regional nature of the certified class and the government's request that the Court limit any relief to the San Francisco Area of Responsibility consistent with the class definition, the district court vacated the guidance documents at issue in this case *nationwide*

for aliens without claims before it. In doing so, it contradicted the Supreme Court's decision in *Trump v. CASA, Inc.*, 606 U.S. 831 (2025), because the universal vacatur has the same effect as a universal injunction.

In *CASA*, the Supreme Court held that universal injunctions likely exceed the equitable authority that Congress granted to district courts. *Id.* at 837. Although the Supreme Court did not decide *CASA* under the APA, it cautioned against awarding complete relief to nonparties. *See id.* at 851. In fact, the Supreme Court explained that "'complete relief' is not synonymous with 'universal relief.'" *Id.*

This Court, even as it rejected the government's argument under *CASA* in *NTSPA v. Noem*, has "acknowledge[d] that there are difficult and unanswered questions related to the limits of APA relief under [*CASA*]." 166 F.4th 739, 767 (9th Cir. 2026). But even if it was impossible to grant complete relief to the parties in *NTSPA* without nationwide vacatur, *id.* at 767-68, that is not the case here. The district court could have vacated the Guidance only with respect to the San Francisco Area of Responsibility. Doing so would have been simple to enforce. Indeed,

ICE is regularly required to alter its operations in certain districts pursuant to similar court orders.

Furthermore, even if vacatur were authorized by the APA, courts retain "equitable discretion" in deciding whether to grant it. *Mont. Wildlife Fed'n v. Haaland*, 127 F.4th 1, 50 (9th Cir. 2025). The district court could have remanded for further agency consideration without vacatur. *Id.* Or it could have entered a vacatur limited to the parties or the geographic area. Either course would have been more consistent with "[t]he equitable tradition" of limiting court remedies to "complete relief *between the parties*." *CASA, Inc.*, 606 U.S. at 837.

The district court blew right past these possibilities in favor of issuing what is effectively a universal injunction, short-circuiting the many other district courts in which these precise issues are being litigated. 1-ER-067–73. To be clear, Defendants maintain that the district court's reviewability and merits analyses were wrong from the start. But even if they are not, the district court entered an improperly broad remedy.

## CONCLUSION

This Court should reverse the district court's judgment and remand with instructions to dismiss Plaintiffs' APA claims.

Dated: September 16, 2026 Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General

DREW C. ENSIGN
Deputy Assistant Attorney General

MARY L. LARAKERS
Senior Litigation Counsel

/s/*Luz Maria Restrepo*
LUZ MARIA RESTREPO
Senior Litigation Counsel
U.S. Department of Justice, Civil Division
Office of Immigration Litigation
P.O. Box 878, Ben Franklin Station
Washington, DC 20044
(202) 598-2443
(202) 305-7000 (facsimile)
Luz.Maria.Restrepo@usdoj.gov

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rules of Appellate Procedure 32 and Ninth Circuit Rule 32-1, I certify that the foregoing was prepared using 14-point Century Schoolbook type; is proportionally spaced; and contains 12,439 words, exclusive of the items exempted by Rule 32(f).

*/s/ Luz Maria Restrepo*
LUZ MARIA RESTREPO
Senior Litigation Counsel
U.S. Department of Justice, Civil Division
Office of Immigration Litigation
P.O. Box 878,
Ben Franklin Station
Washington, DC 20044
(202) 598-2443
(202) 305-7000 (facsimile)
Luz.Maria.Restrepo@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that, on September 16, 2026, I caused the forgoing to be electronically filed with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ ECF system. Plaintiffs' counsel are registered CM/ ECF users and will be served through the CM/ ECF system.

*/s/ Luz Maria Restrepo*
Senior Litigation Counsel
U.S. Department of Justice,
Civil Division
Office of Immigration Litigation
P.O. Box 878, Ben Franklin Station
Washington, DC 20044
(202) 598-2443
(202) 305-7000 (facsimile)
Luz.Maria.Restrepo@usdoj.gov